## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

NORTHERN OIL AND GAS, INC., and NORTHWEST FARM CREDIT SERVICES, FLCA,

          Plaintiffs,

    vs.

CONTINENTAL RESOURCES, INC.,

          Defendant.

CV 14-90-BLG-CSO

**ORDER ADDRESSING CROSS MOTIONS FOR SUMMARY JUDGMENT**

## I.    Introduction

This case stems from a dispute concerning the interpretation of an oil and gas lease. Plaintiffs Northern Oil and Gas, Inc. ("Northern Oil") and Northwest Farm Credit Services, FLCA ("NWFCS") brought this action against Defendant Continental Resources, Inc. ("Continental"). At issue is whether Continental's commencement of drilling operations on adjoining land before the lease's expiration perpetuated NWFCS's lease with Continental beyond its 5-year primary term.

Northern Oil and NWFCS invoke this Court's diversity jurisdiction

under 28 U.S.C. § 1332. With the parties' written consent, this case was

assigned to the undersigned for all purposes. *Notice of Assignment to*

*U.S. Magistrate Judge (ECF No. 23)*; *see also ECF Nos. 22 and 36.*[1]

Pending are: (1) Continental's motion for partial summary

judgment that its lease with NWFCS is valid and in full force and effect

*(ECF No. 44)*; and (2) NWFCS's cross motion for summary judgment

that the lease between it and Continental expired by its terms or, in the

alternative, is expired or void under the doctrine of equitable estoppel

*(ECF No. 50)*. Northern Oil joined in NWFCS's arguments related to

the pending motions. *See ECF Nos. 53 and 63.*

On May 26, 2016, the Court heard oral argument on these

motions. For the reasons discussed below, the Court denies

Continental's motion and grants NWFCS's cross motion as described

herein.

---

[1]"ECF No." refers to the document as numbered in the Court's
Electronic Case Files ("ECF"). References to page numbers are to those
assigned by ECF.

## II.  **Background**[2]

NWFCS, as Lessor, granted an Oil and Gas Mining Lease dated September 29, 2008, covering the west half of Section 10, Township 24 North, Range 52 East, M.P.M., Richland County, Montana, (the "Leased Premises") in favor of Diamond Resources, Inc., as Lessee (the "Continental Lease").  The Continental Lease was for a five-year primary term which expired on September 29, 2013. During the first four years of the primary term, delay rentals were timely and properly paid to NWFCS in accordance with the lease's terms.  On November 9, 2012, Diamond Resources, Inc., assigned the Continental Lease to Continental, effective September 29, 2008.

On June 26, 2003 – that is, more than five years before the Continental Lease – the Montana Board of Oil and Gas Conservation

_____

[2]The background facts are from Continental's Statement of Undisputed Facts *(ECF No. 46)*, NWFCS's Combined Statement of Disputed Facts & Statement of Undisputed Facts *(ECF No. 52)*, and Continental's Statement of Disputed Facts in Opposition to Plaintiffs' Cross Motion for Summary Judgment and In Support of Continental's Motion for Partial Summary Judgment *(ECF No. 60)*.  The parties have injected a liberal amount of argument in responding to one another's factual representations.  The facts, however, are undisputed except where indicated, and those facts in dispute are not sufficiently material to preclude the Court's determination of the motions at hand.

(the "Montana Board") entered Order No. 151-2003.[3]  The Order provides, in part, that "unless an exception is applied for and granted by the [Montana] Board, temporary spacing units in the partial or correctional sections in Township 24, Ranges 51-60E and their adjacent full section are established as follows: . . . Sections 3 and 10, . . . of each respective Township and Range described above unless the affected partial section has already been included in a permanent or temporary spacing unit for Bakken production." *ECF No. 46-5 at 2-3*.  The described area includes the Leased Premises.

On May 8, 2013, Continental filed an application with the Montana Board requesting an order permitting the drilling of a horizontal Bakken/Three Forks Formation well, known as the Sterling 1-3H Well, within the temporary spacing unit consisting of Sections 3 and 10, Township 24 North, Range 52 East, including the Leased Premises.  On June 6, 2013 the Montana Board granted Continental's Application and permitted the drilling of the Sterling 1-3H Well.

---

[3]A copy of the Order is an exhibit in the record.  *See ECF No. 46-5 at 2-3*.  The copy of the Order is unsigned, but the parties rely upon it and do not dispute its contents or authenticity.

On September 18, 2013, Continental commenced construction of the well location for the Sterling 1-3H Well in the east half of Section 3, Township 24 North, Range 52 East, adjacent to the Leased Premises. Construction of that well location continued on September 19 and was completed on September 20, 2013. On September 29, 2013, Continental spudded the Sterling 1-3H Well, set surface casing for the well and drilled for six hours, achieving a depth of 595 feet.

The parties dispute what occurred next at the well. Continental maintains that on October 12, 2013, it "continued drilling operations on the Sterling 1-3H Well with a drilling rig and, thereafter, continuously conducted drilling operations on the well until October 26, 2013, when the objective bottom hole location was reached." *ECF No. 46 at ¶ 9.* NWFCS, on the other hand, maintains that "[d]rilling operations were not 'continued' at all . . . [but rather alleges that] [m]inimum site preparation was completed before the Continental Lease expired by its terms on September 29, 2013[ ]" and argues that "[t]he later operations starting with the drilling rig two weeks after the expiration of the Continental Lease are not sufficient to be defined as 'continued' drilling

operations." *ECF No. 52 at ¶ 9.*

On October 28, 2013, Continental performed a well bore survey on the Sterling 1-3H Well. On October 29, 2013, the drilling rig was released from the Sterling 1- 3H Well. On November 5, 2013, the Sterling 1-3H Well was released to production. On November 27, 2013, Continental fracture stimulated the Sterling 1-3H Well. On January 23, 2014, the Sterling 1-3H Well commenced production of oil and has continuously produced oil to the present date.

Continental and NWFCS dispute whether NWFCS has been paid the correct amount of royalties on oil produced from the Sterling 1-3H Well. Continental maintains that it has paid NWFCS its proportionate share under the Continental Lease's terms. *ECF No. 46 at ¶ 15.* NWFCS argues that the Continental Lease expired by its terms on September 29, 2013, so that Continental has not paid NWFCS its correct proportionate share of royalties because NWFCS's lease with Northern Oil has a higher royalty amount. *ECF No. 52 at ¶ 15.* Continental disputes NWFCS's characterization and argues that the issue of royalties is immaterial to the Court's determination of the

issues raised by the pending motions.  *ECF No. 60 at ¶ 15.*

On March 26, 2014, Continental filed an Application with the Montana Board requesting an Order declaring all of Sections 3 & 10-24N-52E as a permanent spacing unit for production from the Bakken/Three Forks formation.  On May 1, 2014, the Montana Board issued Order 145-2014, granting Continental's Application and designating  all of Sections 3 & 10-24N-52E a permanent spacing unit for production of the Bakken/Three Forks Formation oil from the Sterling 1-3H well.  *ECF No. 46-12.*  Also on May 1, 2014, the Montana Board issued Order 146-2014, ordering that "all interests in the permanent spacing unit comprised of all of Sections 3 & 10, T24N-R52E are hereby pooled on the basis of surface acreage for production of Bakken/Three Forks Formation oil and associated gas."  *ECF No. 46-13.*[4]  This Pooling Order "makes no finding with respect to which lease may provide effective leasehold coverage"  between the disputed leases in this litigation.  *Id. at 2.*

---

[4]These Orders, as filed in the Court's record, are unsigned, but no party disputes their authenticity.

### III.  **Parties' Arguments**[5]

### A.  **Continental**

Continental maintains that the Continental Lease is valid and remains in effect.  Specifically, it argues as follows:

First, Continental began drilling operations at the Sterling 1-3H Well before the end of the lease's primary term.  This activity, by the lease's terms, extended the lease's duration beyond the primary term.  And, under the lease's terms, Continental properly commenced drilling operations and diligently prosecuted drilling operations (i.e., no gaps of more than 60 days), which resulted in a producing well.  *Continental's Mem. in Support of Summary Judgment Mtn. (ECF No. 45) at 9-11*.  Thus, Continental satisfied the lease's requirements respecting extension of the lease's duration.  *Id*.

Second, Continental's drilling operations on the Sterling 1-3H Well took place on land pooled with the Leased Premises.  The land is within a temporary spacing unit, which includes the Leased Premises, created

---

[5]The parties' each advance other arguments supporting their respective positions.  The Court includes here only those arguments that it finds relevant to the ultimate determination of the pending motions.

by the Montana Board.  *Id. at 11-13*.  By the lease's plain terms, "the drilling, completion, and production of oil from the Sterling 1-3H Well satisfied the habendum clause of the Continental Lease and perpetuated that lease beyond its primary term and to the present date." *Id. at 13*.

### B.    NWFCS

NWFCS argues as follows:

The Continental Lease expired on September 29, 2013, because Continental failed to complete actions necessary to extend the lease's term.  Continental did not beginning drilling operations on the Leased Premises before expiration of the primary term because it failed to pool the Leased Premises.  *NWFCS's Br. Supporting Its Mtn. and Opposing Continental's Mtn. (ECF No. 51) at 7-9*.  Continental began the Sterling 1-3H Well in Section 3, which is adjacent to the Leased Premises.  It is undisputed that drilling operations did not occur in Section 10 during the primary term of the Continental Lease.

Although Continental argues that the 2003 temporary spacing unit created a "Unit" as described in the Continental Lease and allowed

the pooling of Section 3 with the Leased Premises, that argument is flawed. The Continental Lease's terms do not support that interpretation. The temporary spacing unit is not a "Unit" under paragraph 3(e) of the Continental Lease. *Id. at 9-14*. The temporary spacing units were created by the Montana Board five years before the Continental Lease as part of a statewide correction to account for discrepancies in acreage created by the curvature of the Earth.

Although part of the Leased Premises lies within the temporary spacing unit at issue, it was not created on application by Continental, nor created for the purpose of drilling the Sterling 1-3H Well. Thus, the temporary spacing unit did not combine the Leased Premises for purposes of oil and gas development. *Id. at 10*. The Montana Board's "creation of a temporary spacing unit does not create a separate property right or grant a permit to drill, nor does it create a permanent spacing unit or right to pool." *Id. at 11* (citation omitted). Instead, a temporary spacing unit only determines the base line size and shape of setbacks for drilling wells, to which operators must ask for exceptions if they desire to drill on a different size or shaped unit. *Id.*

Only a permanent spacing unit order may merge leases to function as a single entity for production from a drilled well. And the pooling here accomplished in 2014 was untimely because "it is a condition precedent under the Continental Lease that pooling of lands outside the Leased Premises where drilling operations are conducted must be completed during the primary term of [the] Lease." *Id. at 12-13* (quotation marks and emphasis omitted).

## C.   **Continental's Response**

Continental responds that the commencement and completion of the Sterling 1-3H Well on the temporary spacing unit was sufficient to extend the Continental Lease's duration. *Continental's Resp. Br. (ECF 59) at 6.* Specifically, Continental argues that: (1) the Continental Lease explicitly defines the spacing unit created by the Montana Board as a "unit" within the meaning of the lease's paragraph 16(b), *id. at 6-9*; (2) the Continental Lease's pooling was accomplished under paragraph 16(b) so that the restrictions on pooling contained in the lease's paragraph 16(a) do not apply, *id. at 9-10*; (3) to the extent statutory pooling is necessary, which Continental disputes, the statutory pooling

order that the Montana Board issued is retroactive to the commencement of operations on the unit and the temporary spacing unit constitutes a de facto pooling order, *id. at 11-14*; and (4) NWFCS drafted the Continental Lease, which should be construed against NWFCS as the lessor, *id. at 14-16*.

### D.    NWFCS's Reply

In reply, NWFCS argues that Continental did not commence drilling operations on the Leased Premises during the primary term because: (1) the temporary spacing unit created before execution of the Continental Lease is not a "unit" under the Continental Lease, *NWFCS's Reply Br. (ECF No. 62) at 3-6*; (2) the Continental Lease provides that, for drilling operations to extend the lease's primary term, they must commence on a "unit" created "during the primary term," and here such operations did not commence during the primary term, *id. at 6-7*; (3) the Continental Lease does not permit a retroactive pooling designation to hold the lease by production past the primary term, *id. at 7-9*; and (4) Montana law provides that courts are to construe oil and gas leases against the lessee, such as Continental, and not against the

lessor, *NWFCS, id. at 9-10.*

## IV. Applicable Law

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact

exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When parties file cross-motions for summary judgment, as here, the Court must consider each motion on its own merits.  *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  The fact that both parties have moved for summary judgment does not vitiate the Court's responsibility to determine whether disputed issues of material fact are present.  *Id.*

### B.    Application of Montana Law

As noted, the Court's jurisdiction over this action is based on diversity of citizenship.  Thus, the Court must apply the substantive law of Montana, the forum state.  *In re County of Orange*, 784 F.3d 520, 523-24 (9th Cir. 2015) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.") (citation omitted); *see also Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

In actions based on diversity jurisdiction, the federal court "is to

approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). Federal courts "are bound by the pronouncements of the state's highest court on applicable state law." *Appling v. State Farm Mutual Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) (citation omitted). But when an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Medical Laboratory Mgmt. Consultants*, 306 F.3d at 812 (citations omitted). In doing so, the federal court must "look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citation omitted).

### C.  Contract Interpretation Under Montana Law

Montana courts, when construing an oil and gas lease, "generally apply the rules of contract interpretation." *Moerman v. Prairie Rose Resources, Inc.*, 308 P.3d 75, ¶ 22 (Mont. 2013) (*citing Sandtana, Inc. v.*

*Wallin Ranch Co.*, 80 P.3d 1224, ¶ 26 (Mont. 2003)).  The "[c]onstruction

and interpretation of a contract present questions of law for the court to

decide."  *Wicklund v. Sundheim*, 367 P.3d 403, ¶ 16 (Mont. 2016)

(citations omitted).   When courts construe such contracts, the

> intention of the parties is to be pursued if possible, and . . .
> this intention is to be gathered from the entire agreement,
> not from particular words or phrases or disjointed or
> particular parts of it. . . .   The contract must be viewed from
> beginning to end, and all its terms must pass in review; for
> one clause may modify, limit or illuminate the other. . . .
> It is well established that a court, in interpreting a written
> instrument, will not isolate certain phrases of that
> instrument in order to garner the intent of the parties, but
> will grasp the instrument by its four corners and in light of
> the entire instrument, ascertain the paramount and guiding
> intention of the parties.

*Moerman*, 308 P.3d at ¶ 22 (citations and internal quotation marks

omitted).

And, "[b]ecause oil and gas leases deal with property rights of a

highly speculative nature, 'the protection of the interests of the lessor is

considered of paramount importance.'" *Id.* (*quoting Stanolind Oil & Gas

Co. v. Guertzgen*, 100 F.2d 299, 300 (9th Cir. 1938)).  Montana courts

construing oil and gas leases, therefore, construe ambiguities "liberally

in favor of the lessor and strictly against the lessee."  *Id.* (*citing Clawson*

*v. Berklund*, 610 P.2d 1168, 1171 (Mont. 1980)).  Also, unlike in other areas of the law where they are disfavored, forfeitures of oil and gas leases are favored "to prevent lands being burdened by profitless and unworked leases."  *Id.* (*quoting Fey v. A.A. Oil Corp.*, 285 P.2d 578, 586 (Mont. 1955) and *citing Christian v. A.A. Oil Corp.*, 506 P.2d 1369, 1372 (Mont. 1973)).

## V.   **Discussion**

It is undisputed that the Continental Lease may be extended beyond its primary term if certain conditions precedent are satisfied. First, Continental, as the Lessee, must commence drilling operations before the end of the primary term and diligently prosecute them as provided in the lease.  Second, such drilling operations must be on the Leased Premises or on lands that "are pooled" with the Leased Premises.

### A.   **Did Continental Commence Drilling Operations Before Expiration of the Continental Lease's Primary Term?**[6]

---

[6]At oral argument, NWFCS conceded, but only for purposes of the pending motions, that Continental commenced drilling operations before the primary term expired.  Northern Oil declined to unequivocally concede the point.  Thus, the Court decides the issue here.

The Continental Lease, dated September 29, 2008, provides in

paragraph 4 – its habendum clause – in relevant part, as follows:

> 4.  Term, Extensions thereof:
>
> It is agreed that this lease shall remain in full force for a primary term of 5 years from this date, and as hereinafter extended, as long as any leased substance is produced thereon or on lands pooled or unitized therewith.
>
> \*      \*      \*
>
> (c)  Drilling Within the Primary Term, Production – It is expressly agreed that if Lessee shall commence drilling operations on the leased premises at any time during the primary term of this lease, the lease shall remain in force and its term shall continue so long as such operations are diligently prosecuted.  If production results therefrom, then this lease shall be extended after the primary term to all formations as long as production in paying quantities continues.

*Continental Lease (ECF No. 46-1) at 3.*

In paragraph 3, the lease defines "drilling operations" and what it

means to "diligently prosecute[ ]" them as follows:

> (f)  Drilling operations – Shall mean the drilling of a well with the intent of discovering commercial quantities of oil and gas, with the well projected to such depth to intersect a target formation which is believed to have a potential for the economic recovery of oil and gas. Drilling operations are interpreted to be from the time

<u>surface well site preparation begins to the final completion or abandonment of the well</u>.

(g)    Diligently prosecuted drilling operations – Shall mean the actual surface well site preparation, spudding, drilling, testing and completion or abandonment as long as there are not any time delays of greater than 60 days between the completion of any one of these operations and the commencement of another.

*Id*. (emphasis added).

Continental has presented evidence that it began well site preparation for the Sterling 1-3H Well on September 18, 2013 – 11 days before the end of the primary term of the Continental Lease. The affidavit of Marcus Simpson ("Simpson"), Continental's Land Operations Coordinator, states that construction of the well location began on September 18, continued on September 19, and was completed on September 20, 2013. *Simpson Aff. (ECF No. 46-3) at ¶ 5; see also ECF No. 46-10* (invoice from David Schillinger Construction dated September 23, 2013, charging $406,561.50 for work including "[r]ip rock and move rock to the fill of the road[ ]" for the Sterling 1-3H Well on "9/18/13, 9/19/13, [and] 9/20/13"). Simpson further states that on September 29, 2013, Continental spud the Sterling 1-3H Well with a surface rig, set

surface casing for the well, and drilled for 6 hours to a depth of 595 feet. *ECF No. 46-3 at ¶ 6; see also 46-9* (drilling report reflecting September 29, 2013 drilling activity at the Sterling 1-3H Well).

From this undisputed evidence, the Court concludes that Continental "commence[d] drilling operations" when it began "surface well site preparation" as contemplated in paragraph 3(f) of the Continental Lease. The Court also concludes that this occurred on September 18, 2013, and for a few days immediately following, which is before the September 29, 2013 primary term expiration date, as contemplated paragraph 4(c) of the lease. And, there has been no argument or evidence presented that Continental failed to diligently prosecute its drilling operations but rather complied with paragraph 3(g) by not having any "time delays of greater than 60 days between the completion of any one of [its drilling] operations and the commencement of another." *See Continental's Stmt. of Undisputed Facts (ECF No. 46) at ¶¶ 9-14.*

NWFCS has presented no evidence disputing Continental's evidence of well site preparation or when it occurred. Rather, as noted,

NWFCS argues that such activities did not occur on the lands pooled

with the Leased Premises. The Court turns next to that issue.

## B. Were Continental's Drilling Operations on Lands Pooled with the Leased Premises?

As refined by the parties in their briefs and at oral argument, the

determinative disputed issue is whether Continental's drilling and

production of the Sterling 1-3H Well in Section 3 extended the primary

term of the Continental Lease, under its provisions in paragraph 16(b).

For the reasons that follow, the Court concludes that it did not.

Paragraph 16(b) provides:

> Notwithstanding anything to the contrary herein contained, it is understood and agreed that in the event during the primary term a portion or portions of the land covered by this lease are pooled either in accordance with Paragraph 16(a) or by a creation of a unit as defined in Paragraph 3(e), then operations on or production from a well situated on lands embraced in such unit, shall serve to maintain this lease in force as to that portion of the leased premises embraced in such a unit. The remainder of the leased premises not included in a unit shall be treated as a separate lease, subject to the terms and conditions of this document.

*ECF No. 46-1 at 5.*

Paragraph 16(b) thus expressly states that, to extend the lease

beyond its primary term, it is necessary that lands covered by the lease

"are pooled" with land on which operation or production is occurring, either in accordance with paragraph 16(a) or by creation of a unit as defined in paragraph 3(e).  Continental acknowledges that the pooling of the Continental Lease was not accomplished under paragraph 16(a).  Thus, the Court turns to paragraph 3(e).

Paragraph 3(e) provides:

Unit – Shall mean a bounded area formed for the purpose of producing oil and gas, which may be described by, but not limited to, the following terms: spacing unit, drilling unit, production unit, secondary recovery unit or federal unit.  This area may contain one or more leases which have been merged together, either voluntarily or by the result of action by any duly authorized authority having jurisdiction, to function as if a single entity.

The size and shape of the unit is to be determined by special field rules granted by the governmental regulatory body having jurisdiction or, in the absence of special field rules, by the general statewide rules and regulations and rules of practice and procedure which relate to oil and gas.

*Id. at 3.*

As an initial matter, the parties agree that there was neither any pooling declaration or agreement nor any compulsory pooling order made before the end of the lease's primary term.  But, as noted, Continental argues that the Montana Board's June 26, 2003 temporary

spacing unit order pooled leased lands in Section 10 with land in Section 3, where it commenced the Sterling 1-3H Well.  The Court is not persuaded.

Continental has cited no clear or controlling authority for its position either from the lease itself, or from Montana statutes or case law.  At oral argument, Continental relied on its interpretation of MCA § 82-11-201 as authority for its position that the 2003 temporary spacing unit order pooled the Leased Premises with land in Section 3 where the well site is located.  But that statute does not address pooling.  And nothing in the Montana Board's 2003 Order mentions pooling.  *See ECF No. 46-5.*

The next section in the Montana Code Annotated, MCA § 82-11-202, does expressly address pooling.  Subsection (1)(a) allows persons voluntarily to pool their interests.  MCA § 82-11-202(1)(a).  This type of pooling did not occur in this case, and subsection (1)(a) is thus not applicable.

Subsection (1)(b) allows the Montana Board, on application of an interested person, to pool all interests in a permanent spacing unit for

development and operation of the permanent spacing unit when the applicant has been unsuccessful, after a good faith attempt, to voluntarily pool the interests within the permanent spacing unit. MCA § 82-11-202(1)(b). In that event, that statute further provides:

> Operations incident to the drilling of a well upon any portion of a permanent spacing unit covered by a pooling order are considered, for all purposes, the conduct of the operations upon each separately owned tract in the spacing unit by the several owners of the tracts. That portion of the production allocated to each tract included in a permanent spacing unit covered by a pooling order must when produced be considered for all purposes to have been produced from the tract by a well drilled on the tract.

*Id*. No such statutory pooling language exists respecting temporary spacing units. In *U.V. Industries, Inc. v Danielson*, 602 P.2d 571, 581 (Mont. 1979), the Montana Supreme Court noted that the foregoing language in the Oil and Gas Conservation Act "provides for the voluntary and involuntary pooling of interests within a spacing unit."

Relevant to the case at hand, the Montana Board did enter a pooling order covering the lands involved, but did so on the same date that it issued its permanent spacing order – May 1, 2014. *See* Order 145-2014 (*ECF No. 46-12 at 3-4*). Both of these orders were made well

after expiration of the lease's primary term and not "during the primary term" as paragraph 16(b) requires.

The Court does note that on May 15, 2014 – just two weeks after the May 1, 2014 Montana Board orders –  Continental executed and filed a "Declaration of Pooled Unit" purporting to make the pooling "effective as of September 1, 2013 ("Effective Date")[.]" *ECF No. 65-1 at 2.*  But even if this declaration is effective, it still does not satisfy the lease's clear requirement that lands "are pooled" "during the primary term[.]"  *ECF No. 46-1 at 5.*  Thus, the Court concludes that the Continental Lease, pursuant to its unambiguous terms in paragraph 16(b), expired at the end of its primary term.

## VI.  <u>Conclusion</u>

For the foregoing reasons, IT IS ORDERED that:

1.  Continental's motion for partial summary judgment that its oil and gas lease with NWFCS is valid and in full force and effect *(ECF No. 44)* is DENIED; and

2.  NWFCS's and Northern Oil's cross motion for summary judgment that the oil and gas lease between NWFCS and Continental expired by its terms (*ECF No. 50*) is GRANTED.

3.  IT IS FURTHER ORDERED that on or before June 21, 2016, the parties must file a Joint Status Report stating what, if any, issues remain unresolved in this case.

DATED this 31st day of May, 2016.

**/s/ Carolyn S. Ostby**
United States Magistrate Judge