## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| NORTHERN OIL AND GAS, INC., and NORTHWEST FARM CREDIT SERVICES, FLCA, | CV 14-90-BLG-TJC |
| Plaintiffs, | **ORDER** |
| vs. | |
| CONTINENTAL RESOURCES, INC., | |
| Defendant. | |

This case originated from a dispute concerning competing oil and gas leases covering a tract of land in Richland County, Montana. Plaintiffs Northern Oil and Gas, Inc. ("Northern") and Northwest Farm Credit Services, FLCA ("NWFCS") originally brought this action against Defendant Continental Resources, Inc. ("Continental"), seeking, *inter alia*, a declaration that Continental's lease had expired and that Northern's lease was valid. Northern and NWFCS invoked this Court's diversity jurisdiction under 28 U.S.C. § 1332. With the parties' written consent, this case was assigned to the undersigned for all purposes. (Doc 23.)

Presently pending before the Court are cross-motions for summary judgment filed by Northern (Doc. 82) and Continental (Doc. 84). Both parties are seeking a determination of the extent to which Northern is required to participate in the costs associated with drilling an oil well in Richland County. The Court heard oral

argument on these motions on September 14, 2017.  For the reasons discussed below, the Court grants Northern's motion and denies Continental's motion.

## I.    Pertinent Facts

On September 29, 2008, NWFCS, as lessor, granted an Oil and Gas Mining Lease covering the west half of Section 10, Township 24 North, Range 52 East, M.P.M., Richland County, Montana (the "Leased Premises"), in favor of Diamond Resources, Inc., as lessee (the "Continental Lease").  The Continental Lease was for a five-year primary term, which expired on September 29, 2013.  On November 9, 2012, Diamond Resources, Inc., assigned the Continental Lease to Continental, effective September 29, 2008.

On May 8, 2013, Continental filed an application with the Montana Board of Oil and Gas Conservation ("Montana Board"), requesting an order permitting the drilling of a well, known as the Sterling 1-3H Well (or the "Well"), within a temporary spacing unit consisting of Sections 3 and 10, Township 24 North, Range 52 East.  The temporary spacing unit included the Leased Premises.  On June 6, 2013 the Montana Board granted Continental's Application and permitted the drilling of the Sterling 1-3H Well.

As explained by Continental in its brief, an operator drilling in a pooled area is required under Mont. Code Ann § 82-11-202 to send all leasehold interest owners a notice of intent to drill, an estimated cost of drilling, and an offer to allow

the owners to participate in the well by sharing in the well costs.  (Doc. 89 at 4.)

An interest owner who elects to participate will share in its proportionate amount

of drilling and production expenses, and also receive its share of income

attributable to their interest, if any.  *Id.*  An owner who refuses to participate in the

well – or in industry parlance, declines to "consent" – does not pay expenses, and

does not receive revenue from the well until drilling and production expenses have

been recovered from revenues and a penalty has been recovered by the consenting

owners.  *Id.* at 4-5.

At the time the drilling permit was granted in June 2013, Northern

indisputably held a leasehold interest in the E/2 of Section 10, Township 24 North,

Range 52 East.  That lease covered a total of thirty-two net mineral acres, equating

to a gross unit working interest of 3.643319% (the "3.6% Lease").  In accordance

with the statutory procedure under § 82-11-202, Continental sent Northern a well

proposal and authorization for expenditure ("AFE") on August 15, 2013, seeking

Northern's commitment to participate in the drilling of the Sterling 1-3H Well.  By

letter dated September 13, 2013, Northern communicated its desire to participate.

(*See* Doc. 86-1.)  On September 18, 2013, Continental commenced drilling

operations on the Sterling 1-3H Well in the E/2 of Section 3, Township 24 North,

Range 52 East.

Approximately six weeks after drilling operations started, NWFCS granted

Northern a new lease covering the W/2 of Section 10, Township 24 North, Range

52 East (henceforth, the "Northern Lease") on October 28, 2013. This lease

covered the same tract previously covered under the Continental Lease.

Continental disputed the validity of the Northern Lease. Continental

maintained that it began drilling operations on Sterling 1-3H Well prior to the end

of the lease's primary term, which, according to Continental's interpretation of the

lease, served to extend the term of the lease beyond the primary term. Northern

asserted, however, that while Continental may have commenced drilling in an

adjoining parcel within the temporary spacing unit, it did not began drilling

operations on the leased premises before the expiration of the primary term. Thus,

Northern maintained, the Continental lease expired on September 29, 2013.

Nevertheless, what is particularly relevant to the parties' present motions is that,

after the Northern lease was granted, Continental never sent Northern or NWFCS a

well proposal or AFE requesting consent to participate in the operation of the

Sterling 1-3H Well with respect to the Northern lease.

On March 26, 2014, Continental filed an Application with the Montana

Board requesting an Order declaring all of Sections 3 & 10-24N-52E as a

permanent spacing unit for production. (*See* Doc. 86-2.) On May 1, 2014, the

Montana Board entered an Order, granting Continental's Application and

4

designating all of Sections 3 & 10-24N-52E a permanent spacing unit for

production of oil from the Sterling 1-3H Well.  Also on May 1, 2014, the Montana

Board issued an Order that "all interests in the permanent spacing unit comprised

of all of Sections 3 & 10, T24N-R52E are hereby pooled on the basis of surface

acreage for production of Bakken/Three Forks Formation oil and associated gas."

Northern also participated in the proceedings before the Montana Board.  In

its findings, the Board specifically recognized that Continental and Northern had

"an ongoing dispute as to the effective leasehold coverage" of their competing

leases.  (*See* Doc. 86-5 at 2.)  The Board's findings also reflect that the parties

acknowledged that the Board's order made "no findings with respect to which

lease may provide effective leasehold coverage," and the parties further

acknowledged that Continental was "not authorized to recoup non-consent

penalties…absent further order of the Board."  *Id*.

Northern filed the instant lawsuit on July 14, 2014.  Northern sought to quiet

title to the disputed leasehold interest in its name, and also sought money damages

for lost oil and gas production revenues derived from the interest.  (Doc. 1.)  This

Court ultimately entered an Order on the parties' cross-motions for summary

judgment on May 31, 2016 (Doc. 70), holding in pertinent part that the Continental

Lease expired by its terms on September 29, 2013, and holding the Northern Lease

to be valid.

Having determined the validity of the parties' leasehold interests, the sole remaining issue in this action is whether Northern should be forced to participate in the costs of drilling and operation for the Sterling 1-3H Well with respect to the Northern Lease as a consenting owner, or whether Northern maintains the right to make an election as to whether it does or does not consent to participate with respect to that share.

## II.    Parties' Arguments

### A.    Northern

Northern argues that it should not be required to consent to Continental's drilling operation with respect to its interest in the Northern Lease.  (Doc. 83 at 2.) Northern makes several arguments in support of its position.

First, Northern argues that the only contract between Northern and Continental is Northern's undisputed consent to participate with respect to the 3.6% Lease, and Continental cannot unilaterally expand the interests covered under that contract to impose an additional consent upon Northern with respect to the Northern Lease.  (*Id*. at 6-7.)

Next, it argues that Continental had a statutory remedy available to it, insofar as it simply could have sent an AFE or amended well proposal to Northern to bind Northern to a consent position.  Northern maintains that Continental's

failure to do so does not justify imposing an election on Northern at this time. (*Id.* at 6-9.)

Finally, Northern argues that Continental is judicially estopped from taking its present position due to the position it adopted before the Montana Board. Specifically, Northern asserts that Continental assented to the inclusion of the language prohibiting Continental from assessing a non-consent penalty against Northern absent further action from the Montana Board. (*Id.* at 9-14.)

## B.    Continental

Continental argues that Northern should be prohibited from taking a non-consent position with respect to the Northern Lease. (Doc. 85 at 2.)

Continental's primary argument is that it would be inequitable to permit Northern to adopt a non-consent position at this time. Continental asserts that Northern's prior conduct evinced its intent to participate in the Well, but Northern changed that position after the price of oil dropped and it learned that the production of the Sterling 1-3H Well was less than anticipated. Continental explains that oil production is an inherently risky enterprise, and allowing Northern to wait until the Well's production capabilities are known (referred to in the industry as "riding the well down") removes the risk associated with a timely decision to consent. Accordingly, argues Continental, Northern should be estopped from adopting a non-consent position merely because it knows now that

such a position is more favorable. Instead, Northern should be forced to consent, thereby accepting its share of the expenses in developing the Well.

Continental also disputes Northern's characterization of Continental's argument as seeking to expand the existing contract covering the 3.6% Lease. Continental argues that there simply is no contract contemplating the Northern Lease, so the Court may exercise its powers in equity without contravening any existing agreement.

Continental also argues, in the alternative, that the Court should remand this issue to the Montana Board if it declines to impose a consent position upon Northern.

## III.   Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider each motion on its own merits when parties file cross-motions for summary judgment. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The fact that both parties moved for summary judgment does not vitiate the Court's responsibility to determine whether disputed issues of material fact are present. *Id.*

As noted, the Court's jurisdiction over this action is based on diversity of citizenship. Thus, the Court must apply the substantive law of Montana, the forum state. *In re County of Orange*, 784 F.3d 520, 523-24 (9th Cir. 2015) ("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.") (citation omitted); see also *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

In actions based on diversity jurisdiction, the federal court "is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). Federal courts "are bound by the pronouncements of the state's highest court on applicable state law." *Appling v. State Farm Mutual Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) (citation omitted). But when an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Medical Laboratory Mgmt. Consultants*, 306 F.3d at 812 (citations omitted). In doing so, the federal court must "look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citation omitted).

## IV. Discussion

The parties agree that Northern's capacity to make a consent/non-consent election is the sole remaining issue in this case, and there are no material facts in dispute. (*See* Docs. 86 and 90.) For the following reasons, the Court grants Northern's motion and denies Continental's motion, ruling in effect that Northern is not estopped from electing to take a non-consent position with respect to the Northern Lease.

## A. Statutory Considerations

The rights and responsibilities of owners and operators within a pooled spacing unit are governed by Mont. Code Ann. § 82-11-202. Relevant to the present issue, the statute outlines the procedures for obtaining an owner's consent to participate in the costs of development and operations within the unit, and the consequences of an owner's refusal to do so. Subsection (2)(a) of the statute provides for the recovery of the costs for development and operations, and states that "the owners who agree to share in the cost of drilling and operating the well are…entitled to receive…all of the production of the well until they have recovered all of the costs out of the production." Further, under subsection 2(b) of the statute, an owner who refuses to agree to pay the owner's share of drilling and completion costs is also subject to a non-consent penalty equal to 100% to 200% of development and production costs. The provisions of subsections 2(a) and (b) are also applicable where "an owner of an oil and gas interest in a temporary spacing unit refuses to agree to pay the owner's share of the costs of drilling and operating a well within the unit and an application is filed for pooling of the interests in the well in a permanent spacing unit." Mont Code Ann. § 82-11-202(2)(e).

In order to assess the non-consent penalty, however, an owner must refuse to participate. In addition, in situations where, as here, a well has been drilled prior to hearing on the pooling application, the owner's refusal to participate must come

"after written demand." Mont Code Ann. § 82-11-202(2)(b). There is no evidence in this case that Northern ever refused to pay its share of costs of development or operations, or that it was ever provided written demand to do so.

Nevertheless, it may be presumed that an owner refused to pay the owner's share of costs under Mont. Code Ann. § 82-11-202(3), which provides as follows:

> (3)(a) An owner is presumed to have refused to pay the owner's share of costs if prior to the spud date of the well, the owner fails to pay or agree in writing to promptly pay the share of the costs after notice by the well operator either:
>
>> (i) acknowledged in writing by the owner as received; or
>>
>> (ii) sent at least 30 days prior to the spud date of the well to the owner by certified mail, addressed to the owner's address of record in the office of the clerk and recorder of the county where the well is to be drilled or to the owner's address on file with the board.
>
> (b) The notice must set forth the location of the well, the projected depth and target formations, the anticipated costs of drilling and completing the well, and the anticipated spud date of the well.

By the statute's plan terms, notice by the well operator setting forth the items enumerated in subsection (3)(b) is a threshold condition before any owner may be presumed non-consent. It is undisputed that Continental did not send a notice to Northern or to NWFCS with respect to the leasehold interest covered by the Northern Lease. Consequently, by the express terms of the statute, it cannot be presumed that Northern did not consent.

In this case, however, Northern did not acquire the lease until after Continental had spudded the Sterling 1-3H Well, by which time Continental had already notified the owners within the spacing unit. Mont. Code Ann. § 82-11-202(3) is silent as to an operator's responsibility to notify an owner that emerges after a well has been spudded. Nevertheless, the fact that Continental did not notify Northern or NWFCS in accordance with Mont. Code Ann. § 82-11-202(3) even after it discovered Northern's claimed interest in the Northern Lease is not in dispute, and the Court declines to read into the statute a non-existent provision that would impose a presumptive non-consent position upon Northern.

Pursuant to Mont. Code Ann. § 82-11-202(3), it cannot be presumed that Northern refused to agree to participate absent written demand or notice. Since Continental did not send such a demand or notice, Northern retains the right to elect whether to consent with respect to the Northern Lease.

## B.     Judicial Estoppel

Notwithstanding any deficiencies in its notice procedure, Continental argues that Northern should be estopped from electing a non-consent position at this time due to the inherent unfairness of allowing it to "ride the well down" and bide its time until it can determine whether consenting in the operation will be profitable. Continental relies on the doctrine of judicial estoppel, the purpose of which, it argues, "is 'to protect the integrity of the judicial process' by 'prohibiting parties

from deliberately changing positions according to the exigencies of the moment.'"
(Doc. 91 at 4 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-751 (2001).)

"[J]udicial estoppel 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 993 (9th Cir. 2012) (quoting *New Hampshire*, 532 U.S. at 749). It is an equitable doctrine invoked "not only to prevent a party from gaining an advantage by taking inconsistent positions, but also because of 'general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'" *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)) (alteration omitted). "A party can be estopped by statements successfully advanced in both judicial and administrative proceedings." *Greene Archives*, 692 F.3d at 993, n. 13.

Though the circumstances where judicial estoppel may apply "are probably not reducible to any general formulation," the Supreme Court has identified the following three factors that courts should consider:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.... A third consideration is whether the party seeking

to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id*. at 993-994 (citing *New Hampshire*, 532 U.S. at 750-751). The Court will consider each of these factors in turn.

### i. Inconsistent Position

The first consideration is whether Northern's present position – namely that it retains the right to elect whether to consent in the Sterling 1-3H Well operation – is clearly inconsistent with any prior position it has adopted. The Court finds no such inconsistency.

First, the record does not contain any evidence that Northern has expressed an intent to consent or not consent with respect to the Northern Lease, whether within this litigation, before the Montana Board, or in any other context. In the absence of any evidence showing that Northern ever expressly made a consent election, the Court cannot find that any election decision made at this time would be inconsistent with its prior position.

Nevertheless, Continental seeks to satisfy the first prong of the judicial estoppel test by implication. Continental maintains that Northern's actions cannot be explained in any way other than that it intended to consent with respect to the Northern Lease up until the time that its "free look down the well" revealed that plan to be economically disadvantageous. Continental cites four instances of Northern's conduct that, in Continental's opinion, demonstrate a clear intent to

consent with respect to the Northern Lease, and which are inconsistent with
Northern's present position that it has not yet made a consent election. These
instances include: (a) purchasing the Northern Lease after the Sterling 1-3H Well
had already been spudded and while Northern had already elected to consent with
respect to the 3.6% Lease; (b) objecting before the Montana Board to any non-
consent penalty; (c) filing this lawsuit and seeking money damages for lost
revenue; and (d) electing to participate in the Sterling 1-3H Well with its other
leasehold interest. (Doc. 89 at 6-12.)

While it is certainly questionable that the "inconsistent position" prong of
judicial estoppel can be satisfied by implication where a party has never actually
adopted or asserted a prior position, the Court nevertheless will address
Continental's arguments on this point.

### a. Northern's Purchase of the Northern Lease

Continental argues that "[t]he simple fact Northern purchased a lease in the
spacing unit for the Sterling 1-3H Well manifests its desire to participate in that
well." (*Id*. at 8.) In support of this conclusion, Continental cites the facts that
Northern knew at the time of purchase that a well was already in the process of
being drilled; Northern had already consented to participate with respect to its
other lease in the spacing unit; and Northern paid a substantial bonus for the lease.
(*Id*.) Each of these factors certainly supports the conclusion that Northern desired

a greater leasehold interest within the Sterling 1-3H Well spacing unit. But it does not necessarily follow that Northern unequivocally intended to consent with respect to that additional interest. The fact that a leaseholder in Northern's position can elect not to consent demonstrates that owning a leasehold interest and consenting to a well operation are not synonymous. A non-consenting owner can still share in revenue from a well after drilling costs and non-consent penalties have been satisfied. The Court cannot say with any certainty that any of the factors Continental cites establish any intent beyond acquiring a further leasehold interest within the spacing unit, which interest Northern can then exercise as it sees fit.

### b. Northern's Objection before the Montana Board

As explained above, Northern participated in proceedings before the Montana Board, which resulted in a ruling from the Montana Board that Continental could not assess a non-consent penalty against Northern with respect to the Northern Lease absent further action by the Board. Continental calls this "the clearest evidence that Northern desired to participate – before oil prices plunged and Northern got a 'free look down the well.'" (*Id.* at 9.) According to Continental, this conduct demonstrates a desire to participate because non-consent penalties are only available against parties that do not participate. (Doc. 85 at 6.)

The Court cannot reach Continental's conclusion. Northern explained at oral argument that the reason for its position before the Montana Board was to

prevent Continental from assessing a non-consent penalty before Northern had the opportunity to make an election. That justification is sufficiently plausible to preclude the Court from reaching the conclusion that Continental urges, which is that Northern's position before the Montana Board is inconsistent with a later desire to not consent. Northern's position before the Montana Board was that Continental should not be allowed to assert a non-consent penalty before Northern made an election one way or another. That position is not inconsistent with Northern's present position.

### c. Filing This Lawsuit and Seeking Monetary Damages

Next, Continental argues that the simple fact of filing this lawsuit and seeking monetary damages for lost revenues demonstrates a desire to participate. The Court is not persuaded. First, again, possessing a valid lease and consenting to a drilling operation are not synonymous. Northern can both (a) validly possess the Northern Lease and also (b) decline to consent in the drilling of the Sterling 1-3H Well. Northern's act of filing this lawsuit in order to quiet title to its leasehold interest has no bearing on how it ultimately decides to exercise its rights under the lease. Additionally, with respect to the monetary damages, a non-consenting leaseholder still may be entitled to revenues from a productive well. See Mont. Code Ann. § 82-11-202(2)(a). Northern's request for any damages to which it may be entitled is not indicative of either a consent or non-consent position.

#### d. Electing to Participate as to the 3.6% Lease

Finally, Continental argues that Northern's election to participate with respect to its preexisting 3.6% Lease indicates an intent to participate as to the Northern Lease as well. Once again, Continental is conflating the possession of a lease and the decision to consent with respect to that lease. Northern has the right to elect whether to consent with respect to any lease it owns within the spacing unit, independent of the decision it makes regarding any other leases it may own. According to Northern, its consent to participate in the additional acreage would have resulted in a five-fold increase in its liability for drillings costs, from $275,842.97 to $1,379,214.85. The fact that Northern was willing to commit to approximately $275,000.00 in liability, does not establish that it would have been willing to risk more than $1,375,000.00. The Court is not in a position to speculate as to what decision Northern would have made had Continental not incorrectly assumed that the Northern Lease was invalid.

For the foregoing reasons, and keeping in mind the fact that Northern undisputedly did not make an express election, the Court finds that Continental has failed to demonstrate that Northern's present position is inconsistent with any position it has previously taken. Judicial estoppel therefore does not apply.

//

//

### ii.    Success of the Earlier Position

Even if Northern had previously adopted the position that it intended to consent in the Sterling 1-3H Well, Continental has not demonstrated that Northern prevailed in that position before a court or administrative body.  There is no history of Northern advancing, much less prevailing upon, that position before this Court.  Therefore, the only remaining possibility is that it advanced the position and prevailed thereon before the Montana Board.  As discussed above (*see* § IV(A)(i)(b), *supra*), Northern did not argue to the Montana Board that it intended to consent in the Sterling 1-3H Well operation.  Rather, the parties acknowledged their dispute, and agreed that Continental could not impose a non-consent penalty without further action from the Montana Board.

It should be noted that Continental still may be able to impose a non-consent penalty upon Northern, subject to Northern electing not to consent and the parties presenting the issue to the Montana Board.  Regardless of what happens in the future, there is no evidence in the record that Northern ever adopted a position declaring an intention to consent to the Sterling 1-3H Well operation, and then prevailed upon that position.

### iii.    Unfair Advantage

Finally, assuming *arguendo* that Northern had both adopted an inconsistent position and then prevailed upon that position, the Court still would have to find

that allowing such conduct would generate an unfair advantage to Northern or impose an unfair detriment upon Continental. Here again, the Court is not persuaded.

It may be true that Continental will be forced to bear an increased financial burden if Northern elects not to consent in the Sterling 1-3H Well operation. Nevertheless, Continental had ample opportunity, beginning when it first discovered that Northern had purchased the lease and at numerous points thereafter, to send Northern an AFE, amended well proposal, or some other request that would have required Northern to make an express consent election. Northern was never spurred to make such an election because Continental never sent any notice or request that it do so. There is nothing that would have prevented Continental from sending a proposal or taking some other action that would bind Northern once Continental knew that Northern claimed a leasehold interest. Continental has not provided any authority to suggest that Northern was obligated to make an election on its own, independent of any request therefor from Continental.

Continental elected to stand pat on its position that its lease was valid, and did not take any steps to bind Northern to an election in the event it was ultimately determined otherwise. Continental's failure to force Northern to make an election before the results of the Well were known does not constitute a "miscarriage of

justice" that would justify the "extraordinary remedy" of judicial estoppel. *Mull v. Motion Picture Industry Health Plan*, 2014 WL 12639071, *14 (C.D. Cal. May 30, 2014).

### C. Continental's Cited Authority

Continental cites several cases in support of the position that courts routinely invoke equitable principles to prevent parties from "riding the well down," and Continental argues that this Court should rule similarly. Cases on which Continental especially relies include *Ranola Oil Corp. v. Corp. Comm'n of Okla.*, 752 P.2d 1116 (Okla. 1988), *Harding & Shelton, Inc. v. Prospective Inv. & Trading Co.*, 123 P.3d 56 (Okla. Civ. App. 2005), and *Samedan Oil Corp. v. Comm'n of Okla.*, 755 P.2d 56 (Okla. 1988).

Continental is correct that these cases generally stand for the proposition that courts are reluctant to reward parties who ride the well down, and thereby remove the uncertainty inherent to the oil exploration business. *See, e.g.*, *Harding & Shelton*, 123 P.3d at 63-65. However, all of these cases are inapposite here because they each involve a party that previously made an election and subsequently attempted to change that election. The instant case is readily distinguishable because, as discussed previously, Northern has never made an election with respect to the Northern Lease.

//

**D.     Remand to the Montana Board**

Finally, in the event the Court declines to force a consent election upon Northern, Continental requests that the Court remand the case to the Montana Board to determine whether Northern should be permitted to make an election. Continental does not dispute the Court's jurisdiction to determine the issues presented by the parties' cross-motions, and the Court has before it sufficient undisputed facts to decide the parties' motions on their merits. The Court therefore denies Continental's request.

**V.     Conclusion**

Based on the foregoing, IT IS ORDERED that:

(1) Northern's Motion for Summary Judgment (Doc. 82) is GRANTED; and

(2) Continental's Motion for Declaration of Law (Doc. 84) is DENIED.

DATED this 27th day of September, 2017.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge